UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LAURA FLETCHER, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 4:14 CV 886 JMB ) |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

Plaintiff Laura Fletcher ("Plaintiff") brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the Commissioner's final decision denying her applications for Supplemental Security Income ("SSI"), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Commissioner shall be reversed and the matter is remanded for proceedings consistent with this Memorandum and Order.

### I. PROCEDURAL HISTORY & SUMMARY OF DECISION

Plaintiff filed an application for SSI benefits in January 2011, alleging a disability onset date of January 1, 2011. After her application was denied on June 28, 2011, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on November 27, 2012. Two witnesses testified at the hearing – Dr. Gerald Belchick, a vocational expert ("VE"), and Plaintiff. Prior to the hearing, Plaintiff amended her onset date to June 18, 2012. On April 9,

2013, the ALJ issued an unfavorable, written decision, finding that Plaintiff was not under a disability, as defined by the Social Security Act. (Tr. 10-19)[1]

In denying Plaintiff's claim of disability, the ALJ followed the familiar five-step sequential evaluation process for determining whether Plaintiff was disabled within the meaning of the Act. (Tr. 10-12) See 20 C.F.R. §§ 404.1520(a) and 416.920(a). At step one, the ALJ found that Plaintiff was not engaged in substantial gainful activity since her alleged onset date. At step two, the ALJ found that Plaintiff suffered from two severe impairments -- psychotic disorder (NOS) and polysubstance abuse. No physical impairments were noted. (Tr. 12-13) At step three, the ALJ concluded that Plaintiff's mental impairments did not meet or equal the criteria for a listed impairment. (Tr. 13-15) The ALJ found that Plaintiff had only mild restrictions relative to the activities of daily living, moderate difficulties relative to social functioning, and moderate difficulties with concentration, persistence, or pace. (Tr. 14)

At step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC") as follows:

[T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to understand, remember, and carry out at least simple instructions and non-detailed tasks and to respond appropriately to supervisors and co-workers in a task oriented setting where contact with others is casual and infrequent. The claimant cannot have constant/regular contact with the general public and cannot perform work which includes more than infrequent handling of customer complaints. The claimant cannot perform work in an environment in close proximity to alcohol/controlled substances.

(Tr. 15) In making this RFC assessment, the ALJ declined to give any weight to a medical source statement completed by Dr. Jaron Asher on October 31, 2012. (Tr. 16-17) Dr. Asher was Plaintiff's treating psychiatrist. The ALJ also found Plaintiff's credibility to be "weakened." (Tr. 17-18)

---

[1] References to "Tr." are to the administrative record filed by the Commissioner (ECF No. 12-3).

Plaintiff filed a timely request for review by the Appeals Council. On March 14, 2014, the Appeals Council denied Plaintiff's request (Tr. 1), leaving the ALJ's April 9, 2013, decision as the final decision of the Commissioner in this matter. Plaintiff has exhausted her administrative remedies and the matter is properly before this Court.

In her request for judicial review, Plaintiff contends that the ALJ erred in declining to give any weight to the medical source statement of Dr. Asher. (ECF No. 19 at 13) In her argument, Plaintiff notes that the ALJ apparently misunderstood some of Dr. Asher's observations regarding the frequency of Plaintiff's auditory hallucinations. (Id. at 23) The Commissioner agrees that the ALJ made this mistake. (ECF No. 22 at 5-6) The Commissioner contends, however, that the mistake does not require a remand.

Having reviewed the record, and in light of controlling legal standards, the Court concludes that substantial evidence does not support the Commissioner's decision. As explained in detail below, the ALJ's mistake regarding the frequency of Plaintiff's hallucinations is significant. The ALJ's misunderstanding regarding Dr. Asher's observation resulted in a finding of an inconsistency where there was none. Correcting that mistake has the potential to impact the proper weight to be given to Dr. Asher's medical source statement, as well as the proper assessment of Plaintiff's credibility. Accordingly, the matter must be remanded for further proceedings.

## II. SUMMARY OF RECORD[2]

### A. General History and Characteristics of Plaintiff

At the time of her hearing, Plaintiff was 26 years old. Plaintiff has a lengthy history of mental illness, dating back to when she was approximately ten years old. The record indicates

---

[2] The undersigned has reviewed the entirety of the administrative record in resolving the issues presented in this matter. The recitation of specific evidence in this Memorandum and

that Plaintiff was initially diagnosed with depression. Over the years, Plaintiff has also been diagnosed with schizophrenia. Plaintiff has a significant history of polysubstance abuse, including the use of heroin, marijuana, and alcohol. Plaintiff completed high school at an alternative high school. Plaintiff completed some college, as well as an EMT course. Plaintiff has scant work history – working briefly in 2008 and again in 2009, with lifetime earnings of less than $4,000. (Tr. 118, 120)

As reflected the record, Plaintiff has been treated by a number of psychiatrists over the years. Plaintiff has also been hospitalized due to her mental illness and substance abuse. For example, Plaintiff was hospitalized in September 2008 at St. John's Mercy Medical Center due to a "recent exacerbation of auditory hallucinations and social withdrawal." (Tr. 194-214) In June 2012, Plaintiff was hospitalized for acute opiate withdrawal. Upon her discharge, Plaintiff received out-patient treatment and assistance at Places for People. Plaintiff amended her alleged disability onset date to coincide with her discharge in June 2012.

B.  **Summary of Administrative Hearing**

On November 27, 2012, the ALJ conducted a hearing on Plaintiff's case. Plaintiff was represented by counsel at the hearing. Two witnesses testified during the hearing – Plaintiff and Dr. Gerald Belchick, a VE. Plaintiff testified that she had about two years of college education. (Tr. 26-27) Plaintiff explained that she had never worked a full-time job for six months or longer. (Tr. 27) Plaintiff had completed opiate detox, followed by rehab in June 2012. (Tr. 27-28) Plaintiff testified that she began seeing Dr. Asher after her prior psychiatrist had medical problems. (Id.) Plaintiff explained that she has been "schizophrenic for years," with symptoms including visual, auditory, and tactile hallucinations. (Id.) At the time of her hearing, Plaintiff advised she had not used opiates since her detox, and had not used marijuana since she was 18.

---

Order is intended to provide context to the Court's decision.

Plaintiff had, however, used alcohol. (Tr. 29) Plaintiff regularly attended NA meetings and was receiving support from Places for People. (Tr. 29-30)

Dr. Belchick, the VE, heard Plaintiff's testimony and was given an opportunity to examine the record. The ALJ posed a single hypothetical question to Dr. Belchick. The ALJ asked Dr. Belchick to consider a hypothetical claimant who was 25 years old, with no past relevant work, and no physical restrictions. The hypothetical claimant also had the following limitations: (1) the ability to understand, remember, and carry out at least simple instructions and non-detailed tasks; (2) the ability to respond appropriately to supervisors and co-workers in a task oriented setting where contact with others is casual and infrequent; (3) could not have constant/regular contact with the general public; (4) could not perform work which includes more than infrequent handling of customer complaints; and (5) could not perform work in an environment in close proximity to alcohol/controlled substances. (Tr. 33)

In response to the ALJ's hypothetical question, Dr. Belchick testified that such a claimant would be capable of performing work as a housekeeper / hotel maid or kitchen helper, both of which would be unskilled jobs, performed at the light level. (Tr. 33-34)

Plaintiff's attorney posed several hypothetical questions to Dr. Belchick. First, Dr. Belchick was asked to assume a hypothetical claimant with marked limitations in her abilities to: (1) cope with normal work stress; (2) function independently; (3) behave in an emotionally stable manner; (4) accept instructions and respond to criticism; (5) maintain socially acceptable behavior; (6) understand and remember simple instructions; (7) make simple, work-related decisions; (9) maintain attention to work tasks for up to two hours; (9) perform at a consistent pace; (10) sustain an ordinary routine without special supervision; and (11) respond to changes in the work setting. (Tr. 35) Dr. Belchick opined that such a person would not be employable. (Id.)

Plaintiff's attorney also asked Dr. Belchick to consider a hypothetical claimant with the same age, education, and work experience as Plaintiff, but with a medically determinable impairment that would cause unpredictable, ten-minute interruptions (in addition to regular breaks) on a daily basis. (Tr. 35-36) Dr. Belchick advised that a ten-minute interruption was "right at the border," and anything in excess of ten minutes per day would be a problem for an unskilled worker. (Tr. 36) Plaintiff's attorney then asked Dr. Belchick to consider the ramifications of arriving late for work, unpredictably, once per week. Such a claimant, per Dr. Belchick, would not be able to maintain employment. (Id.)

### C. Medical Evidence

The issue on before the Court relates to the opinions of Dr. Asher regarding Plaintiff's non-exertional limitations in his mental medical source statement. The parties agree that the ALJ mischaracterized Dr. Asher's observations regarding the frequency of Plaintiff's hallucinations. As explained below, the Court concludes that the ALJ erroneously relied on this mischaracterization in declining to give any weight to Dr. Asher's opinions. The relevant record evidence is discussed below in the context of analyzing the ALJ's consideration of Dr. Asher's opinions.[3]

## III. LEGAL FRAMEWORK & STANDARD OF REVIEW

To be eligible for SSI under the Social Security Act, a plaintiff must prove that she is disabled. See Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

---

[3] The Court has thoroughly considered the entire record, including all of the medical records filed in this matter. A detailed summary of the record is not necessary to resolving the

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a plaintiff is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). At step one, the Commissioner considers whether a claimant is engaged in substantial gainful activity. If so, disability benefits are denied. At step two, the Commissioner decides whether the claimant has a "severe" medically determinable impairment, or combination of impairments, which significantly limits her ability to do basic work activities. If the claimant's impairment is not severe, then she is not disabled. If the impairment is severe, the Commissioner then determines at step three whether such impairment meets or is equivalent to one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. If a claimant's impairment meets or equals one of the listed impairments, she is conclusively disabled. At step four, the Commissioner establishes whether the claimant's impairment prevents her from performing her past relevant work. If the claimant can perform such work, she is not disabled. Finally, if the claimant is unable to perform her past work, the Commissioner continues to step five and evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. The claimant is entitled to disability benefits only if she is not able to perform other work.

---

particular issue presented for the Court's consideration.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. See 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). "Substantial Evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Myers v. Colvin, 721 F.3d 521, 524 (8th Cir. 2013) (internal quotations omitted). The "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotations omitted). "Substantial evidence on the record as a whole … requires a more scrutinizing analysis." Id. (internal quotations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.
2. The [plaintiff's] vocational factors.
3. The medical evidence from treating and consulting physicians.
4. The [plaintiff's] subjective complaints relating to exertional and non-exertional activities and impairments.
5. Any corroboration by third parties of the [plaintiff's] impairments.
6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the [plaintiff's] impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court also must consider any evidence which fairly detracts from the Commissioner's decision. See Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999) (citation omitted). "If, after reviewing the entire record, it is possible to draw two inconsistent positions, and the Commissioner has adopted one of those positions," the Commissioner's decision must be affirmed. Anderson v. Astrue, 696 F.3d 790, 793 (8th Cir. 2012). The decision may not be reversed merely because substantial evidence also could support a contrary outcome. See Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

## IV. ANALYSIS OF ISSUE PRESENTED

In her brief in support of her complaint (ECF No. 19), Plaintiff raises one issue for this Court's consideration. Plaintiff argues that the ALJ erred in declining to give any weight to certain opinions of Dr. Asher. (Id. at 12) The Commissioner contends that the ALJ properly discredited those opinions and, therefore, substantial evidence supports the Commissioner's denial of benefits.

The Court does not read the Commissioner's brief as suggesting that Dr. Asher was not in a treating relationship with Plaintiff. Further, the parties are in agreement that Plaintiff suffers from severe non-exertional impairments, including a psychotic disorder and polysubstance abuse. More importantly, Plaintiff and the Commissioner agree that the ALJ misread or misunderstood Dr. Asher's statement regarding the frequency of auditory hallucinations experienced by Plaintiff. As explained below, this misunderstanding or mistake is not harmless.

### A. Summary of Dr. Asher's Treatment History and Opinion

Dr. Asher was one of Plaintiff's treating physicians.[4] Dr. Asher, and the staff at Places for People, saw plaintiff numerous times between 2011 and 2012. (Tr. 277-327) Consistent with the other medical evidence in the record, Plaintiff reported problems with hallucinations, including auditory hallucinations. Over the course of his treatment, Dr. Asher consistently diagnosed Plaintiff as suffering from schizophrenia (undifferentiated type) and polysubstance abuse. On June 6, 2012, Plaintiff reported to Dr. Robinson that the voices in her head continued, even though she was taking an antipsychotic (Goedon) at a rate above the safe maximum. (Tr. 307) Plaintiff also reported that when she stopped using heroin, the voices got worse. (Id.)

---

[4] The record indicates that Plaintiff had seen several psychiatrists, including Dr. Gordon Robinson. The record also indicates that Plaintiff stopped seeing Dr. Robinson due to that

Dr. Asher saw Plaintiff several times after she completed hospitalization for opiate withdrawal and residential support from Queen of Peace Center. On July 25, 2012, Plaintiff reported to Dr. Asher that, although the voices in her head were better, "she believes that others can hear her thoughts telepathically and they put voices in her head like death threats because they are annoyed at the thoughts she is having." (Tr. 315) On August 29, 2012, Plaintiff reported she continued "to have voices that bother her." Dr. Asher noted that Plaintiff "closes her eyes and seems somewhere else for a while." (Tr. 319) Information from the team monitoring Plaintiff at Places for People reported to Dr. Asher that Plaintiff had "remained sober." (Id.) On October 24, 2012, Plaintiff was still complaining about voices, although it was better.

On October 30, 2012, Dr. Asher completed a Mental Medical Source Statement ("Mental MSS") in anticipation of Plaintiff's claim for Social Security benefits. Dr. Asher concluded that Plaintiff suffered from marked limitations in all aspects of daily living, including her ability to cope with normal work stress and behaving in an emotionally stable manner. (Tr. 324) Dr. Asher concluded that Plaintiff suffered from extreme or marked limitations in all aspects of social functioning. According to Dr. Asher, Plaintiff exhibited extreme limitations regarding her ability to relate to social situations and interact with the general public, and marked limitations regarding her ability to accept instructions/respond to criticism, and maintain socially acceptable behavior. (Id.) Dr. Asher also concluded that Plaintiff had marked limitations regarding concentration, persistence, or pace, with an extreme limitation in her ability to work in coordination with others. (Tr. 325) Dr. Asher also opined that Plaintiff would have persistent problems with work interruptions, tardiness, and absenteeism in a work setting. (Id.)

---

physician's own health problems. (Tr. 301)

Dr. Asher concluded that it was "hard to know if [Plaintiff] has eliminated her substance use completely but it does seem better." (Id. at 326; 327) Dr. Asher noted that Plaintiff "[c]onstantly reports hallucinations," and that she is "[o]n antipsychotics that are able to give her some subjective relief only. Whenever I see her, at least once she appears to be responding to stimuli that aren't there. This impairs her concentration so much that I can't see how she could maintain gainful employment at all." (Tr. 326)

The ALJ declined to "give any weight to the medical source statement completed by Dr. Asher on October 30, 2012 …." (Tr. 16) As noted by the Commissioner (ECF No. 22 at 5-6), the ALJ provided numerous reasons for completely discounting Dr. Asher's opinions relating to Plaintiff's functional limitations. (Tr. 16-17) For example, the ALJ concluded that Dr. Asher was inconsistent in his statements regarding "the extent of [Plaintiff's] drug use and the [effect] it had on her functioning." (Tr. 16) The ALJ believed Dr. Asher was inconsistent because Dr. Asher opined that Plaintiff's functional limitations were not caused by substance abuse because she was maintaining sobriety, but also stated that it was hard to know whether Plaintiff had "reduced her substance abuse." (Id.) The ALJ suggested that Dr. Asher should have ordered a drug screen to confirm his belief that Plaintiff's functional limitations were not caused by substance abuse. (Id.)

The medical record, however, would seem to corroborate Dr. Asher's conclusion that Plaintiff's mental health problems existed despite her substance abuse history. In fact, the medical record indicates that Plaintiff's mental health issues, including her history of auditory hallucinations existed when she was not abusing drugs. For example, Plaintiff's father reported that Plaintiff suffered from problems, including depression/bi-polar disorder since she was ten years old. (Tr. 140) Plaintiff was admitted to St. John's Mercy Medical Center in September 2008 for "acute onset of psychotic symptoms characterized by auditory hallucination …." (Tr.

195) Urine drug screening tests were conducted on Plaintiff by St. John's Mercy at that time. Those tests were uniformly negative.[5] (Tr. 208-09) In addition, other record evidence indicates that, although Plaintiff has a history of substance abuse, she did not start abusing heroin until after she began experience auditory hallucinations.[6] Therefore, the fact that Dr. Asher did not order a drug screen to confirm whether Plaintiff might be using drugs does not provide a significant basis for discounting Dr. Asher's opinion.

Furthermore, the ALJ discussed the potential impact of Plaintiff's substance abuse prior to his consideration of the specific functional limitations indicated in Dr. Asher's medical source statement. When the ALJ considered the specific functional limitations, the ALJ relied on inconsistencies in Dr. Asher's treatment notes, as well as other record evidence, to entirely discount Dr. Asher's opinions.

One of the important inconsistencies the ALJ perceived was that Dr. Asher's treatment notes were inconsistent regarding the frequency with which Plaintiff experienced hallucinations. The ALJ found that Dr. Asher's notes "clearly show that [Plaintiff] had significant improvement in her condition …." (Tr. 17) In construing those notes, the ALJ next noted that "Dr. Asher stated that [Plaintiff] reported 'constant hallucinations,' and yet he acknowledged that he had only observed her on one occasion to be responding to some stimuli that wasn't there." (Id.) Both parties agree that this is a mischaracterization of the record with respect to Dr. Asher's

---

[5] Plaintiff's urine was screened for amphetamines, opiates, cannabinoids, and cocaine metabolites, among other drugs. Plaintiff was admitted on September 11, 2008, and the drug screen was conducted on September 14, 2008. Plaintiff was discharged on September 17, 2008. (Tr. 208) When Plaintiff was admitted to St. Mary's Health Center in June 2012 for acute opiate withdrawal, her drug screen detected opiates, but no other drugs were detected. (Tr. 268-76)

[6] For example, Plaintiff told Dr. Robinson that she started abusing heroin when the voices started. (Tr. 239-40) She advised the staff at Places for People, including Dr. Asher, that she started abusing heroin because she wanted the voices to go away. (Tr. 289)

observations. In fact, Dr. Asher's observed that, on every occasion in which he had seen Plaintiff, she appeared "at least once" to "respond[] to stimuli that aren't there." (Tr. 326)

The ALJ also discredited Plaintiff's subjective complaints relating to the impact of auditory hallucinations for several reasons. (Tr. 17) These reasons included Plaintiff's testimony and demeanor at the hearing, her poor work history, an alleged inconsistent statement regarding her educational history,[7] and a lack of proof that she was no longer abusing drugs. (Id.) It is not clear from the record, however, whether the ALJ's analysis was influenced by his belief that Dr. Asher had only observed Plaintiff responding to hallucinations on one occasion.

The ALJ's mistaken understanding of Dr. Asher's observations has a potentially significant ripple effect because a correct understanding could alter the ALJ's RFC determination. Moreover, the ALJ did not specifically address other record evidence that may have been consistent or inconsistent with Dr. Asher's opinions.

A claimant's RFC is the most that claimant can do despite their limitations. 20 C.F.R. § 404.1545(a)(1). In determining a claimant's RFC, the ALJ should consider "all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations." Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (internal quotations omitted). While the RFC determination occurs at step four, where Plaintiff has the burden of proof, the Eighth Circuit has explained that the ALJ has primary responsibility for determining the RFC. Id.

Thus, to determine Plaintiff's RFC, the ALJ must at least consider her treating physician's opinion(s). Under the Commissioner's regulations, a treating physician's opinion is

---

[7] The Court agrees that one medical record indicates that Plaintiff reported to Dr. Robinson that she had more education than she acknowledged during her hearing. The ALJ used this discrepancy in discrediting Plaintiff. The entire record, however, includes numerous instances in which Plaintiff reports an educational history that is largely consistent with her

ordinarily afforded controlling weight. See 20 C.F.R. § 404.1527. "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where the treating physician renders inconsistent opinions that undermine the credibility of such opinions." Perkins v. Astrue, 648 F.3d 892, 897-98 (8th Cir. 2011) (internal quotations omitted). "Even if the … opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight." Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007).

In the present case, the ALJ completely discounted Dr. Asher's opinions regarding Plaintiff's functional limitations. The ALJ did not cite to "other medical assessments [that] are supported by better or more thorough medical evidence." Perkins, 648 F.3d at 897-98. Rather, the ALJ noted perceived inconsistencies in Dr. Asher's treatment notes as a significant reason for discounting Dr. Asher's opinions. As indicated above, however, even the Commissioner acknowledges that the ALJ incorrectly characterized at least one aspect of Dr. Asher's observations/treatment notes. This is not a mistake that can be easily ignored. It is possible that the ALJ would give some weight, perhaps even substantial weight, to Dr. Asher's opinions upon accurately considering Dr. Asher's observations regarding the frequency of Plaintiff's hallucinations. Likewise, with a correct understanding of the medical evidence, the ALJ might not discount Plaintiff's subjective complaints as steeply. In either case, the ALJ would also be required to reconsider the limitations to be included in Plaintiff's RFC.

For these reasons, the Court cannot conclude that the ALJ's decision regarding Plaintiff's functional limits is supported by substantial evidence in the record as a whole.

---

testimony. (Tr. 205, 250, 280, 292)

## VII. CONCLUSION

For the foregoing reasons, the Court concludes that the Commissioner's adverse decision is not supported upon substantial evidence on the record as a whole and the decision of the Commissioner should be reversed. In particular, the Court concludes that the ALJ erred in construing Dr. Asher's treatment notes with respect to the frequency of Plaintiff's hallucinations. Consequently, the decision to completely discredit Dr. Asher's opinions rested, at least in part, on a faulty premise. Similarly, the decision to discount Plaintiff's subjective complaints likewise rested, at least in part, on a faulty premise. The Court cannot presume that the ALJ's mistake had no influence on how he weighed the evidence.

Upon remand, the Commissioner shall the consider opinions in Dr. Asher's mental medical source statement in light an accurate account of Dr. Asher's observations regarding the frequency of Plaintiff's hallucinations. The Commissioner shall also reconsider Plaintiff's credibility in light of a correct consideration of Dr. Asher's observations.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and the cause is **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum and Order.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this __30th__ day of June, 2015.

> */s/ John M. Bodenhausen*
> JOHN M. BODENHAUSEN
> UNITED STATES MAGISTRATE JUDGE